Matthew M. Clarke, State Bar No. 184959
Dugan P. Kelley, State Bar No. 207347
Matthew N. Mong, State Bar No. 273337
CHRISTMAN, KELLEY & CLARKE, PC
1334 Anacapa Street
Santa Barbara, CA 93101
Telephone: (805) 884-9922
Facsimile: (866) 611-9852

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

Nelson Deedle, an individual; and Iconographs, Inc., a Nevada Corporation,

Plaintiffs,

vs.

Collectors Universe, Inc., a Delaware Corporation, doing business as PSA/DNA; James Spence Authentication LLC, a New Jersey Limited Liability Company; R&R Auction Company, LLC; Roger Epperson doing business as Signed Sealed and Delivered and Roger Epperson Authentication, Ltd; Steve Cyrkin, individually and doing business as live.autographmagazine.com; and Momentica, LLC, a California Limited Liability Company,

Defendants.

Case No.:

**COMPLAINT FOR:**

1. **VIOLATION OF 15 U.S.C. §1**
2. **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**
3. **VIOLATION OF CALIFORNIA BUS. & PROF. CODE §17200**

Plaintiffs Nelson Deedle and Iconographs, Inc., (collectively referred to as "Plaintiff" or "Deedle") hereby complains against Defendants Collectors Universe, Inc., doing business as PSA/DNA, James Spence Authentication LLC, R&R Auction Company, LLC, Roger Epperson doing business as Signed Sealed Delivered and Roger Epperson Authentication, Ltd., Steve Cyrkin, and Momentica, LLC, (collectively referred to as "Defendants"), and alleges as follows:

1. All allegations in this Complaint are based upon information and belief with the exception of those allegations, which are based upon personal knowledge. Plaintiff's information and belief is based upon Plaintiff's own investigation and the informal discovery and investigation conducted by Plaintiff's counsel to date. Each allegation in this Complaint either has evidentiary support, or alternatively, is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

## I. <u>INTRODUCTION</u>

2. In the autographed memorabilia industry, the authenticity of an item is the value of an item. Defendants have joined together as a complex association of autograph dealers, auction houses, authenticators, and public personalities to act as the only authority on authenticating items that dealers are attempting to sell to their customers. Through this association and combination, Defendants are now targeting their competition, such as Deedle, by failing the authenticity of the items that their competition sells to increase their own market presence. Such activity is per se illegal according to federal anti-trust laws, and Deedle now comes to hold Defendants responsible and break up Defendant's cartel.

## II. <u>JURISDICTION AND VENUE</u>

3. This Court has jurisdiction over this action according to 15 U.S.C §15 and 28 U.S.C. § 1331.

4. Venue is appropriate in this district under 15 U.S.C. §22 and 28 U.S.C. §1391(b) because Defendants Collectors Universe, Inc., doing business as

PSA/DNA, Steve Cyrkin, and Momentica, LLC, all transact business in this district and a substantial part of the events that give rise to this claim happened in this district.

## III. PARTIES

5. Plaintiff Nelson Deedle is an individual residing in the State of California, and is a leading dealer in autographed memorabilia throughout the United States for at least 25 years. Deedle operates as a dealer on an individual basis and through his company, Iconographs, Inc., a Nevada corporation.

6. Defendant Collectors Universe, Inc., is a Delaware Corporation, doing business as and through its division known as PSA/DNA ("PSA/DNA"). PSA/DNA is an autograph authentication company and is the self-proclaimed "leading third-party authentication service for autographs and memorabilia." ABOUT PSA AND PSA/DNA, http://www.psacard.com/About/PSA/ (last visited April 16, 2015). PSA/DNA's principal office is located in Orange County, California. It may be served with process by serving its registered agent Michele R. Taylor at its registered address at 1921 E. Alton Ave., Santa Ana, California 92705.

7. Defendant James Spence Authentication LLC, is a New Jersey Limited Liability Company ("JSA"). JSA is an autograph authentication company and is the self-proclaimed "foremost autograph authentication service in the world." AUTOGRAPH AUTHENTICATION FOR SPORTS MEMORABILIA, http://www.spenceloa.com (last visited April 16, 2015). JSA operates out of two principal offices located in the States of New Jersey and Florida. It may be served with process by serving its registered agent in New Jersey, Roy I. Weitzer, at its registered address in New Jersey at 143 Washington Street, Morristown, New Jersey 07960, or its registered agent in Florida, James Spence, III, at its registered office in Florida at 3223 N.W. 10th Terrace, Suite 104, Fort Lauderdale, Florida 33309.

8. Defendant R&R Auction Company, LLC, is a New Hampshire Limited Liability Company ("R&R"). R&R is an online autograph auction company that sells

and authenticates autographed memorabilia to the public throughout the world, including the State of California. R&R may be served with process by serving its registered agent in New Hampshire, Gallagher, Callahan & Gartrell, P.C., at its registered office in New Hampshire at 214 N. Main Street, Concord, New Hampshire 03301.

9. Defendant Roger Epperson, individually and doing business as Roger Epperson Authentication, Ltd. and Signed Sealed Delivered, (collectively "Epperson") is a resident of the State of Texas and does business throughout the United States, including the State of California, through his various business entities and on behalf of PSA/DNA and JSA. Epperson may be served with process at his address at 11011 Tulip Garden Court, Houston, Texas 77065, or any other place that he may be found.

10. Defendant Steve Cyrkin, individually and doing business as live.autographmagazine.com (collectively "Cyrkin") is a resident of the State of California and does business throughout the United States through his website live.autographmagazine.com. Cyrkin may be served with process at his address at 3650 Aspen Village Way, Apt E., Santa Ana, California 92704, or any other place that he may be found.

11. Defendant Momentica, LLC, a California Limited Liability Company ("Momentica"), is the registered domain owner of autographmagazine.com, the domain in which Cyrkin uses to do business. Momentica may be served with process by serving its registered agent in California, Steven L. Cyrkin, at its registered address in California at 3650 Aspen Village Way, Apt. E, Santa Ana, California 92704.

12. Whenever in the Complaint reference is made to "Defendants, and each of them" such allegations shall be deemed to mean the acts of Defendants acting individually, jointly, and/or severally.

13. Plaintiff is informed and believes, and based thereon alleges, that at all

times mentioned herein, each of the Defendants were the agent, servant, employee, co-venturer, and co-conspirator of each of the remaining Defendants, and was at all times herein mentioned, acting with the course, scope, purpose, consent, knowledge, ratification, and authorization for such agency, employment, joint venture and conspiracy.

## IV. FACTUAL ALLEGATIONS

### A. The Autograph Memorabilia Industry

14. The autographed memorabilia industry (the "industry") is a two billion dollar industry that consists of multiple persons and entities engaged in the buying and selling of autographed items (collectively "items") signed by various entertainment, sports, and political celebrities (collectively the "celebrities").

15. The industry is comprised of about 30 major dealers and seven major auction houses with a variety of smaller individual dealer and auction houses involved in the industry. In addition, the market consists of third-party authenticators, of which two dominate the market, those being Defendants' PSA/DNA and JSA.

16. Within this highly concentrated market are a variety of individuals that multiple companies, including auctioneers, dealers, and authenticators, share amongst themselves to control the industry to the detriment of those that are not in this "inner circle." It is within this cartel of companies that the major, self-interested, third-party authenticators can drive out the competitors of certain auctioneers and dealers to ensure that their preferred auction houses and dealers thrive. The Defendants make up this inner-circle, and are using their conjoined market power in an effort to stifle legitimate competition in the industry by agreeing to disparage Deedle and his items for sale as forgeries, not based on the items themselves, but on the singular fact that Deedle is selling the item.

17. At the heart of the industry are the items that people collect. These items are physical objects that are actually signed by historical or contemporary celebrities.

For historical items, dealers and collectors will purchase these items from numerous sources, including directly from the estates or families of deceased celebrities, other dealers and collectors, or from auctions. For contemporary items, dealers will purchase items either through their own personal contracts with celebrities for private signings, buying various autograph collections, writing celebrities via the mail, or through in-person events where collectors/dealers actually witness the celebrity signing the item.

18. Dealers such as Plaintiff will sell their items on through their own retail sales, either in brick and mortar stores or through online stores. Additionally, dealers will sell their items through memorabilia shows. Most, if not all, dealers also use third-party auctions to consign items for sale. These auctions can be in person or online. Online auctions are becoming more and more common, as most consumers are using eBay or Amazon to purchase autographed memorabilia. In addition to these generic auction online houses, there are certain auction houses that exclusively sell memorabilia, such as RR Auctions.

19. When dealers acquire items for resale, Dealers must issue their own certificates of authenticity ("COA") certifying that the item is authentic. In addition to COAs, Dealers will also provide a money-back guarantee to the authenticity of the items they sold, making it against their economic interest to sell forged items. Dealers are able to issue their COAs and guarantee the authenticity of their items based on their own personal knowledge of the history of the item, including personally witnessing the item actually being signed by the celebrity, or by using their own authentication processes to ensure the authenticity of the item. For over one hundred years, Dealers would sell their items without any third-party authentication.

20. The value of an item is based in its authenticity. Items that are branded inauthentic are basically worthless. Therefore, to ensure the value of their items that they are purchasing, selling, or offering for consignment, dealers, collectors, and

auction houses will use third-party authentication services to get a second opinion on the authenticity of an item. Currently, two firms dominate the third-party authentication market: Defendants PSA/DNA and JSA. PSA/DNA and JSA are two of the three approve third-party authenticators for use with eBay, and offer their services nationwide. Dealers and collectors that purchase items will use PSA/DNA and JSA for opinions regarding the authenticity of an item, and then if PSA/DNA or JSA find that an item is not authentic, then the dealer or collector will go back to the source that they purchased the time and demand a refund.

21. When items are sold using an auction house on consignment, each auction house typically has an acquisitions person or a consignment director who examines items presented by dealers and collectors to be placed on consignment and put on sale via an auction. The auction house will either judge the authenticity of the item through an in-house authenticator, or it will utilize a contracted authenticator. Once it passes authentication, the consigned item is then placed in the auction house's catalogue. The catalogue describes the item states who has authenticated the item. Auction houses will usually partner with a third-party authenticator or promote that its uses a third-party authenticator to bolster its credibility under the illusion of objectivity and neutrality.

22. Within this market, PSA/DNA, JSA, R&R, Epperson, and Cyrkin have joined together in a conspiracy, through their intertwined relationships, to drive out their competition, such as Deedle, to the detriment of competition in the market and to Deedle's harm.

**B. The Cartel**

23. PSA/DNA, JSA, R&R, Epperson, and Cyrkin have together in a network of influence to discourage their competition through using the power of PSA/DNA and JSA's market influences over the public perception of the authentication of items that are sold in the market. A review of the major actors that each organization shares and has conspired with shows the cartel that the Defendants have created in

the autograph marketplace.

24. PSA/DNA and JSA, as a self-purported third-party authenticators, employ and advertise their respective networks of authenticators to perform authentication services on behalf of PSA/DNA and JSA. Most of PSA/DNA and JSA's authenticators perform as authenticators for each other company, as the same authenticators are acting on behalf of PSA/DNA and JSA. In addition, some authenticators that are working for PSA/DNA and JSA are also authenticating through their own services, such as Epperson and John Reznikoff, or providing authentication services for auction houses, such as R&R, who stand to profit by ensuring that PSA/DNA or JSA, and their authenticators, are closely aligned to pass items as authentic in the auction house. Furthermore, most authenticators that PSA/DNA, JSA, and R&R use are also dealers themselves, who stand to make a profit from ensuring their items pass PSA/DNA, JSA, or R&R authentication through working both sides of the deal – dealing in autographs and authenticating those autographs through PSA/DNA, JSA, and R&R to ensure their value and ultimate sale. A review of each defendant and their advertised experts shows how deep these relationships run to ensure that this cartel can control the market.

***1. The Cartel Shares the Same Authentication Staff***

25. At all times relevant herein, PSA/DNA employed Roger Epperson, James Spence, Bob Eaton, John Reznikoff, Steve Zarelli, James Camner, Rich Consola, and Wade Hampton as authenticators for its services.

26. JSA employs most of the same experts as well, including Roger Epperson, James Spence, Bob Eaton, John Reznikoff, Steve Zarelli, Wade Hampton, and JD Bardwell.

27. Most of these authenticators do not just work for PSA/DNA and JSA, but also for R&R, which uses Roger Epperson, Bob Eaton, John Reznikoff, Steve Zarelli, James Camner, and Rich Consola to authenticate items submitted for consignment.

28. James Spence began JSA after leaving PSA/DNA. He is the current

owner/operator of JSA and also deals in autographed memorabilia. During his time at PSA/DNA and now at JSA, James Spence has consistently dealt in autographed memorabilia through his entity out of Pennsylvania, James Spence III Vintage Autographs, LLC.

29. Bob Eaton is the owner and founder of R&R. Through R&R, Bob Eaton sells thousands of autographed memorabilia through consignments and profits through those sales. He is also a listed expert for PSA/DNA and JSA, and routinely ensures that items being sold on R&R pass PSA/DNA or JSA authentication so that he can profit from such sales.

30. John Reznikoff is the owner of University Archives, dealing in autographed and signed memorabilia from political figures. Through University Archives, Reznikoff sells signed memorabilia as well as his authentication services. In addition, he is a listed authenticator for PSA/DNA, JSA, and R&R. Some of the items that Reznikoff sells through University Auctions actually carry letters of authenticity from JSA and PSA/DNA.

31. Steve Zarelli is the owner of Zarelli Space Authentication, LLC, providing authentication services for PSA/DNA, JSA, and R&R. Included in his services, Zarelli also actively promotes R&R by advertising the auction house as the premier auction for space services, which such auctions carry Zarelli's certifications of authenticity.

32. James Camner is the owner of La Scala Autographs, dealing in opera, music, and theatrical autographs. Through his website and on eBay, Camner sells hundreds of autographed memorabilia. In addition to his sales, he actively authenticates for PSA/DNA and R&R.

33. Roger Epperson is a third-party autograph authenticator and autograph dealer. Epperson offers his authentication services through his business known as Roger Epperson Authentication, Ltd., and deals in autographs through his business known as Signed Sealed Delivered. Epperson also currently provides authentication

services for R&R on and during the relevant times as provided herein provided authentication services for PSA/DNA and JSA. http://www.spenceloa.com/OurExperts. As late as 2014, PSA/DNA advertised Epperson as part of their "Dream Team" and was "PSA/DNA's Music Man." http://web.archive.org/web/20140810095137/http://www.psacard.com/Articles/ArticleView/4616/buildingadreamteam. In addition, Epperson himself advertises that he is "the full time music authenticator for JSA since November 2006 – Present." http://autographalerttruth.com/credentials.html. Furthermore, Epperson and Cyrkin are close allies on Cyrkin's website he runs through Momentica, known as Autograph Magazine Live, where Cyrkin fully endorses Epperson and Epperson fully endorses Cyrkin publicly in shaming other dealers. Furthermore, Cyrkin and Epperson actively ran advertisements for Epperson's businesses on the website to promote his businesses over other dealers.

34. Steve Cyrkin is an autograph collector, dealer, and authenticator. Cyrkin is also one of the founding owners of Collectors Universe (the parent company of PSA/DNA); in fact, Cyrkin at one time owned 1,000,000 share of Collectors Universe, Inc stock and may still own stock. Cyrkin owns the website named Autograph Magazine Live through his entity, Momentica, and uses this website to host blogs, sell merchandise and advertising regarding autographed memorabilia, and comment about the market, including using the website as his public platform to promote certain dealers and authenticators in the market and totally destroy others. Cyrkin and Epperson actively use the website to defame dealers and authenticators in hopes of driving business to either Epperson, to PSA/DNA, or to any of their own friends in the industry, including R&R and JSA.

***2. The Cartel Also Shares Information***

35. In addition to sharing the same experts, these seeming "competitors" in the autograph memorabilia market are not competitors in any sense of the word. Through their shared staff and relationships, the cartel routinely shares information

with each other regarding the autographed memorabilia market.

36. As an example, Cyrkin routinely includes Epperson, John Reznikoff, Bobby Livingston (of R&R), and Bob Eaton (of R&R and PSA/DNA) on private emails when discussing other sellers or authenticators and their business, including persons like Deedle and another man, Steve Koschal. Furthermore, through other litigation, Epperson routinely shares information he obtains in discovery with Cyrkin.

37. R&R and PSA/DNA also collaborate on the authentication of items that R&R sells. In one circumstance, an R&R customer bought over $70,000 of items in an auction that R&R hosted and guaranteed the authentication of the items. The customer submitted the items to PSA/DNA after the auction for authentication without disclosing the fact that the items came from R&R. PSA/DNA failed the authenticity of these items, and upon the customer requesting refunds from R&R, R&R' representative Bobby Livingston immediately engaged PSA/DNA's Joe Orlando and Byron Walters for an explanation. Through various emails, R &R Auctions even requested that PSA/DNA work with R&R to make R&R whole for the PSA/DNA fees that it was going to reimburse the customer. Thus, R&R is ensuring the authentication of its items from PSA/DNA so much that whenever PSA/DNA fails the authentication of an item that R&R sells (without knowing that it came from R&R), R&R demands that PSA/DNA make it whole for the transaction.

### ***3. The Cartel Uses Their Power to Drive Out Competition***

38. Instead of judging the authenticity of an item based on the signature and the item itself, PSA/DNA, JSA, R&R, Epperson, and Cyrkin are all using their market power they have created from their agreement to employ and utilize this network of authenticators, dealers, and media personalities to come together in a tacit agreement to ensure that certifications of authenticity are issued only to those dealers that they approve. Using this power, they have decided to quash multiple competitors' abilities to do business in the industry, such as Deedle's business.

39. PSA/DNA, JSA, R&R, Epperson, and Cyrkin, have created a cartel

where they can control the authentication market to ensure the items sold through R&R or through the authenticator's own dealer-websites are "certified" authentic, and therefore, more valuable. Furthermore, this cartel exists to drive out any competition from the market by intentionally failing the authenticity of a dealer's items based on the dealer's identity and not on the item itself.

**C. The Cartel Colludes to Automatically Fail Deedle's Memorabilia**

40. Throughout the years, PSA/DNA, JSA, R&R, Epperson, and Cyrkin have come together to reject the authenticity of the memorabilia that Deedle sells not based on the actual authenticity of the various items, but on the basis that Deedle sold the items. The individual Defendants' actions show that they are in collusion with one another, as they share the same experts who publicly malign Deedle as well as fail his items as non-authentic.

41. Sometime in the early part of the 2010's, Roger Epperson found out that Deedle purchased Iconographs, Inc., and was dealing under that name. Despite Epperson signing up for Iconographs' auctions under Deedle's ownership, bidding on autographs based on their own merits and placing orders for autographs via email, Epperson protested his disdain for Deedle to fellow cartel members, including Cyrkin. Epperson further protested in an email to Deedle that he didn't know that Deedle owned Iconographs when he attempted to buy autograph from Iconographs. It became clear to Deedle that Epperson's behavior was not based on the merits of the autographs but rather something more nefarious. Because of Deedle's business with another autograph dealer that Roger Epperson did not like - Todd Mueller – Roger Epperson began a public decry of Deedle with Cyrkin on Cyrkin's website live.autographmagazine.com. In turn, PSA/DNA, JSA, and RR Auction began to fail the authenticity of Deedle's items because Deedle sold the items and not based on the individual authenticity of each item.

***1. PSA/DNA's Actions***

42. Since around 2010 or 2011, PSA/DNA has begun to fail all of Deedle's

items, not based on the authenticity of the items themselves, but on the fact that Deedle sells the items. Below are examples, among many more, of PSA/DNA's failing of Deedle's items based on the fact that Deedle sold the item.

a. In 2011, Ian Causer, an autograph dealer in the United Kingdom, purchased three Harrison Ford autographed photographs from Deedle. He resold one of the photographs to another customer who then submitted the item to PSA/DNA for authentication. PSA/DNA summarily failed the authenticity of the item based on seven (7) different reasons in line with their standard letter (see below). Mr. Causer demanded a full refund for all photos because all of them, like the one, would fail PSA/DNA's authentication process. Deedle refunded Mr. Causer's money and Mr. Causer has since ceased doing business with Deedle because of the embarrassment.

b. In 2011, Chris Sink purchased six autographed album covers from Deedle and submitted two of them (a Carlos Santana LP cover and a Neil Young LP cover) to PSA/DNA for authentication. PSA/DNA summarily failed the authenticity of these items even though Deedle actually procured the Young LP cover himself from Neil Young! Nonetheless, Deedle was required, according to his own guarantee, to refund Mr. Sink's money and since then Mr. Sink has failed to do business with Deedle. In fact, Mr. Sink was so upset about the fact that PSA/DNA failed the authenticity of Deedle's item that he joined Epperson's campaign against Deedle on live.autographmagazine.com.

c. Joe Zacarro purchased a number of items from Plaintiff from 2009 until 2011. In late 2011, Zacarro, after a string of rejections from PSA/DNA and JSA (see below), stopped purchasing from Plaintiff unless PSA/DNA and JSA started to pass the authentication of items that Plaintiff sold. Included in the string of rejections were items that Zacarro purchased

from Deedle that PSA/DNA and JSA rejected that Deedle actually obtained from private signing with Gary Busey and Peter Mayhew.

d. Similar to Zacarro, Gary Novak purchased a number of items from Plaintiff well into 2014. However, Novak stopped purchasing from Plaintiff because PSA/DNA (and JSA) would continually fail all of the items Novak purchased from Plaintiff.

43. One of the most glaring examples of how PSA/DNA operates in conjunction with Deedle's items, that is failing the authenticity of the item because Deedle sold the item, is PSA/DNA's "Quick Click Opinion". Through this option, consumers can received PSA/DNA's "quick opinion" regarding the authenticity of an item that is being sold in an online auction. To receive an opinion of whether the items is "likely genuine" or "not likely genuine", a consumer must fill out a "submission form" on PSA/DNA's website for $15 per item review, or $10 for an item sold on in an eBay auction. According to the submission form, a consumer *must* indicate what auction the item is listed in, indicating exactly *who* is selling the item through the auction or what auction house is selling the item. PSA/DNA then has the ability to control the opinion not based on the authenticity of the item itself, as would be available if a consumer was able to just upload an image, but based on who is selling the item, which is exactly what PSA/DNA is doing to harm Deedle.

44. Starting sometime in 2010 or 2011 and continuing to this date, Deedle has received numerous complaints from his now former customers that PSA/DNA's quick click opinion almost always indicated that items with his COA were "likely not authentic" whether the item was sold on Deedle's own website or consigned on a different auction website with Deedle's COA.

45. Because of these issues, Deedle decided to test PSA/DNA's quick click opinion. On July 30, 2012, Deedle purchased 8 autographed items from multiple sources that had PSA/DNA certifications already on the item in the eBay auctions. Deedle then removed the PSA/DNA certifications on the digital images that

represented the items using Adobe Photoshop. Deedle then reposted the items for sale on Plaintiff Iconograph's website for sale using the Photoshopped images and then submitted the links to the items to PSA/DNA's quick click opinion service using a new, dummy identification. As a control, Deedle also submitted a random item from eBay to the quick click opinion service at the same time using the same dummy identification. PSA/DNA returned *all* of the original 8 items that Deedle had posted on Iconograph's website for sale as "likely not authentic" and PSA/DNA returned the control item on eBay as "likely authentic". Thus, even though the 8 items were previously authenticated by PSA/DNA, when the certifications were removed and posted on Plaintiff's website, PSA/DNA then called them not authentic. This operation shows that PSA/DNA would not authenticate an item that came from Deedle just on the mere fact it came from Deedle.

***2. JSA's Actions***

46. Since 2010 and 2011, JSA, in line with PSA/DNA, has failed all of Deedle's items, not based on the authenticity of the items themselves, but on the fact that Deedle sells the items.

47. Included in JSA's total rejection of Deedle's items are the following examples:

a. Joe Zacarro, as described above, purchased numerous items from Deedle over a three year period. During this time, JSA began to routinely reject the authenticity of any items that Zacarro presented for authentication to JSA that he had obtained from Deedle, including items that Deedle actually obtained personally from "in-person signings".

b. Bob Jones was a regular customer of Plaintiff's until JSA began failing all of Deedle's items. Sometime in 2011, Bob Jones acquired a collection of items from Deedle and then submitted them to JSA. Deedle had to refund all of Jones' moneys because, as Jones informed Deedle, "JSA returned [the] package after 7 weeks and said every item was not

authentic including names identical to those they passed before…" Deedle had to refund everything Jones had purchased. Jones has since stopped buying from Deedle.

c. In 2013, after having issues with JSA authenticating Deedle's items, Pristine Auctions, an auction house, asked that required all items sold through Pristine to have JSA Certificates of Authenticity. Because of this, Deedle submitted approximately one hundred items to Pristine without his own COA on them. Pristine then submitted the items to JSA for authentication. Every item passed JSA's authentication. However, at the same time, Deedle had Pristine submit items with Plaintiff Iconographs COA to JSA as well. JSA failed 90 of the 92 submitted for authentication. Most items from both submissions were of the same names and from the same signings, including documented private signings. However, JSA discriminated against the authenticity of the items solely on the fact of where they came from; if from Deedle/Iconographs, then not authentic.

48. In 2014, JSA's actions were confirmed through one of Deedle's former longtime customers, as noted above, Gary Novak. Novak gave a friend 84 items to have JSA authenticate at trade show in Chicago. Gary's friend submitted the 84 items to Charlie Price (JSA's authenticator) for authentication, 3 of which came from Deedle. Price passed the 81 items as authentic that did not come from Deedle, and rejected the authenticity of the 3 items that came from Deedle, stating that "I know where [the friend] got these and they're no good." Novak returned these items to Deedle for a refund and has not purchased any items from Deedle since.

49. Later in 2014, Deedle, knowing that JSA was failing his items based on the sole fact that he sold them tried his theory. Deedle took two of the three items that Novak returned – a Jim Carrey signed photo and a Sugarland signed photo – and removed his COA. He then gave the Carrey to a friend to take for JSA authentication

at the Beverly Hills Baseball Card shop in Beverly Hills, California. JSA passed the authentication of the Carrey photo (JSA #K74862) without the Iconograph COA even though JSA had failed the authenticity of the exact same photo a few months earlier when it had the Iconographs COA.

50. Likewise, Deedle provided the Sugarland photo, *sans* COA, to a different friend to the Frank & Sons Show in Southern California in December, 2014. Again, JSA passed authentication of the Sugarland photo (JSA #L70070) without the Iconograph COA even though JSA had failed the same exact photo a few months before when it had the Iconographs COA.

### *3. PSA/DNA and JSA Use Essentially the Same Form Rejection Letter*

51. PSA/DNA and JSA's letters rejecting the authenticity are basically the same type of form letter. PSA/DNA includes ten (10) reasons that an item is not authentic, with no specificity as to exactly why an item failed authentication. One of the reasons (No. 10) is actually "Other: _____________", with no information filled in. JSA issues a similar form letter including thirteen (13) reasons that any item is not authentic. Other than a few additional reasons, one omission, eight of JSA's reasons are the exactly identical to eight of PSA/DNA's reasons, including the same exact wording, capitalization, and punctuation.

### *4. R&R' Actions*

52. Before the cartel began their campaign against Deedle, Deedle and Bob Eaton (with RR Auctions) had a good relationship. Deedle's relationship with Eaton lasted over 20 years with Eaton continuously seeking Deedle's autographs and Deedle selling Eaton thousands of items valued at least $500,000 without incident, dispute, and complaint over authenticity. However, after Epperson began his public campaign against Deedle, RR Auctions began failing items that Deedle personally attempted to consign through RR Auctions' auctions as well as items that other persons were attempting to consign with RR Auctions. The degradation of the relationship between Deedle and RR Auctions is intrinsically linked with Epperson's

disdain for Deedle, as Epperson acts as RR Auctions' expert authenticator for music memorabilia. In fact, Cyrkin told Deedle over the phone that RR Auctions would soon no longer accept Deedle's consignments several months before Livingston stated that was the case. Just like PSA/DNA and JSA, RR Auctions began failing items with Deedle's COA because they came from Deedle. In the summer of 2014, RR Auction contacted Deedle several times by phone, and email asking Deedle to consign autographs to their annual music auction. Deedle sent his longtime associate Bob Eaton (of RR Auction) a large consignment package via Federal Express largely consisting of autographs that Deedle obtained himself, obtained from a private signing or from well know book signings. Although the items were unquestionable authentic and consistent with items that RR Auction routinely sells, Deedle received a rejection letter from Bobby Livingston (on behalf of RR Auction) informing Deedle that RR Auction had consulted with outside experts (undoubtedly Epperson, PSA, or both) and did not feel that the autographs would appeal to their clientele. Deedle called Livingston immediately after receipt of the return and Livingston confirmed to Deedle that RR Auction was ceasing to do business with Deedle because of their close relationship with Epperson and RR Auction's distain for Deedle's association with dealer Todd Mueller. In the year since RR Auction rejected Deedle's items, RR Auction has sold similar items.

53. In 2012, Gary Harvey purchased a Pearl Jam signed album cover from Plaintiff with Plaintiff's COA and tried to consign it with RR Auctions. When Harvey first submitted the album for consignment, RR Auctions approved the authenticity of the item for sale on Harvey's scanned image of the album cover that did not include the Iconograph COA. However, when RR Auctions received the actual, physical item from Harvey for consignment, which included the Iconograph COA, RR Auction then changed its mind and told Harvey it could not auction the item because it was inauthentic.

### *5. Epperson's & Cyrkin's Round Out the Cartel With Publicity*

54. Epperson has actively used live.autographmagazine.com to call items that Deedle would sell that people asked about on the website, which Cyrkin runs. Multiple posts show that Epperson has only an interest attacking all of Deedle's items as forgeries.

55. Epperson is not operating in a vacuum by making these statements, but openly and publicly, from 2010 until now, suggests all of Deedle's items are forgeries while at the same time providing authenticating services for PSA/DNA, JSA, and RR Auctions. Instead of focusing on each individual item, Epperson, instead, publicly states his belief that all of Deedle's items are forgeries, and flexes his ability to harm Deedle individually in the marketplace by officially stating the same through his authentication services at PSA/DNA, JSA, and RR Auctions.

56. Thus, Epperson, to promote his own authentication expertise in the public sphere, and also to enhance his ability to sell his own "authentic" items that he certifies as authentic. In essence, Epperson is using his platform through live.autographmagazine.com (Cyrkin's website through Momentica) and his connections with PSA/DNA and his current authentication positions with RR Auctions and JSA to ensure that Deedle cannot sell his items as authentic so that Epperson can sell more of his items.

57. Furthermore, Epperson has rejected items that Deedle tried to sell as inauthentic when he found out that they came from Deedle. Bob Jones submitted certain items to Epperson for authentication and for purchase that Jones had purchased from Deedle. However, Epperson emailed Jones telling him that he (Epperson) did not feel comfortable doing business with Jones because he was purchasing items from Deedle. Shortly thereafter, Jones submitted 6 items to Epperson for authentication that contained the Iconographs COA, which Epperson summarily failed the authenticity of each item. Around this same time, Epperson informed Jones that Deedle himself was forging these items and likened Deedle to a

cocaine dealer.

58. Cyrkin, similar to Epperson, has also taken to openly and publicly denounce everything that Deedle sells as forged items. Cyrkin, like Epperson, does not do this in a vacuum either, but as a co-founder and one-time large stock holder of PSA/DNA's parent company Collectors Universe and Epperson's closest ally in the industry. In fact, Epperson at one time paid Cyrkin or Momentica over $6,000 per year in advertising monies to advertise on live.autographmagazine.com. Although Cyrkin has publicly stated that he isn't an expert – that doesn't stop him from making malicious attacks concerning autographs that are offered by Deedle. Cyrkin and Epperson work closely to promote the cartel. In one instance after Cyrkin denounced an autograph that Iconographs was selling as an "obvious forgery," Epperson followed up announcing that he had the same autograph for sale.

59. Cyrkin's ability to pick and choose which autograph dealers he likes or dislikes, such as Deedle, and then call out all of their items as forgeries helps him attract advertising revenues from other, friendly dealers and auctions houses, such as Epperson, as well as helps PSA/DNA earn more money by encouraging consumers to use PSA/DNA's services to further validate what Cyrkin and Epperson have already said. This cycle of interwoven relationships and suggestions based on Cyrkin's statements that Deedle's items are all authentic provide Cyrkin, Epperson, PSA/DNA, JSA, and RR Auctions to all profit from ensuring that Deedle is forced out of the legitimate competition of selling authentic autographed memorabilia.

60. Cyrkin routinely edits or deletes posts that are not in the interest of the cartel or close friends. Negative posts about RR Auction, or close friends like Autograph Pros and UK dealer Gary King have been drastically edited or deleted all together. In one instance an entire thread exposing Gary King for selling thousands of dollars of forged music autograph was deleted by Cyrkin. Although Cyrkin has been told by Deedle, and Deedle's agents, that several posts about Deedle are not accurate or outright lies, Cyrkin refused to take action and remove these false

statements.

61. Furthermore, Cyrkin has engaged Deedle's customers, similar to Epperson, to denounce Deedle and harm Deedle's business. Sometime in 2012, Cyrkin email Bob Jones and told Jones that Cyrkin "knew" that Jones was trying to sell forgeries that came from Deedle and that the FBI was getting involved. This email prompted Jones to discontinue purchasing any further items from Plaintiff.

62. Deedle now brings the following causes of action to hold this cartel of PSA/DNA, JSA, R&R, Epperson, and Cyrkin responsible for the damage they have caused to the autograph memorabilia industry as well as his own business.

**First Cause of Action**

**Violation of 15 U.S.C. §1**

**(Against All Defendants)**

63. Plaintiff alleges and incorporates each and every allegation contained in the preceding paragraphs as though fully incorporated herein and made a part hereof.

64. Section 1 of the Sherman Act provides that "[e]very ... combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States ... is hereby declared to be illegal." 15 U.S.C. § 1.

65. As detailed herein, PSA/DNA, JSA, R&R, Epperson, Cyrkin, and Momentica have all joined together in a combination or conspiracy to agree to boycott certain autograph memorabilia dealers in the autograph memorabilia market, such as Deedle, by agreeing not to do business with Deedle or by agreeing to fail the authenticity of all or a substantial percentage of Deedle's items based on the fact they came from Deedle and not on the actual authenticity of the item, all in violation of Section 1 of the Sherman Act, Section 1.

66. As detailed herein, PSA/DNA, JSA, R &R Auctions, Epperson, Cyrkin, and Momentica have all joined together in a combination or conspiracy to restrain trade in the autograph memorabilia market to enhance their own positions in the market as authenticators, dealers, and consignors by illegally driving out legitimate

competition, such as Deedle, all in violation of Section 1 of the Sherman Act.

67. Section 4 of the Clayton Act provides that "... any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15.

68. As a direct and proximate result of the aforesaid combination or conspiracy among PSA/DNA, JSA, R&R, Epperson, Cyrkin, and Momentica, and the actions taken pursuant thereto, Deedle has been injured in his business and property as follows: (a) Plaintiff has lost clients and been unable to sell its products, and has lost substantial income and profits as a result; (b) Plaintiff has been precluded from business growth that it otherwise would have achieved; and (c) Plaintiff has otherwise been injured in its business and property.

69. As a result of these federal antitrust violations, Plaintiff is entitled to recover its actual damages in an amount exceeding $3,000,000, subject to proof at trial, multiplied by three, and the cost of suit, including a reasonable attorney's fee.

70. In addition, Deedle requests any and all possible exemplary damages as determined by a jury after a trial against Defendants' for Defendants' egregious and malicious actions against Deedle's business.

**Second Cause of Action**

**Intentional Interference with Prospective Economic Advantage**

**(Against All Defendants)**

71. Plaintiff alleges and incorporates each and every allegation contained in the preceding paragraphs as though fully incorporated herein and made a part hereof.

72. Deedle has had numerous established business relationships with consumers in the sale of autographed memorabilia, including hundreds of loyal customers who had purchased approximately over $4,000,000 before the actions which took place as described herein. Because of the nature of his customers, and the

past dealings that Deedle had enjoyed with his customers, free from the cartel of PSA/DNA, JSA, R&R, Epperson, Cyrkin, and Momentica's actions, Deedle had a reasonable probability that such customers would continue to do business with him in the future. In others words, such relationships would have led to potentially profitable contracts for sales of autographed memorabilia without the interference of the cartel failing the authentication of Deedle's autographed memorabilia without actually examining the items themselves.

73. As indicated herein, Defendants, and each of them, wrongfully opined to and affirmatively failed the authenticity of Deedle's items, not based on the actual authenticity of the items themselves, but on the fact that Deedle sold the items.

74. Defendants, and each of them, failed the authenticity of Deedle's items on the basis that Deedle sold the items to intentionally and knowingly to deter customers from purchasing items from Deedle and having Deedle to have Deedle issue refunds for the items that were sold, thereby damaging Deedle's ability to freely and legitimately sell authentic items in the marketplace.

75. As a direct and proximate result Defendants' actions, Deedle has been injured in his business and property as follows: (a) Plaintiff has lost clients and been unable to sell its products, and has lost substantial income and profits as a result; (b) Plaintiff has been precluded from business growth that it otherwise would have achieved; and (c) Plaintiff has otherwise been injured in its business and property.

76. As a result of Defendant's illegal and intentional interference with Deedle's business, Deedle has incurred actual damages in an amount that is ongoing and that has not yet been fully ascertained but which is at least $4,000,000 for the loss of sales to his customers and his loss of business that he would have made but for Defendants' actions.

77. In addition, Deedle requests any and all possible exemplary damages as determined by a jury after a trial against Defendants' for Defendants' egregious and malicious actions against Deedle's business.

78. Furthermore, Deedle requests all costs of court for bringing this claim.

**Third Cause of Action**

**Violation of California Bus. & Prof. Code §17200**

**(Against All Defendants)**

79. Plaintiff alleges and incorporates each and every allegation contained in the preceding paragraphs as though fully incorporated herein and made a part hereof.

80. Business and Professions Code §17200 prohibits any "unlawful, unfair or fraudulent business act or practice."

81. As indicated herein, Defendants, and each of them, wrongfully opined to and affirmatively failed the authenticity of Deedle's items, not based on the actual authenticity of the items themselves, but on the fact that Deedle sold the items.

82. Defendants, and each of them, failed the authenticity of Deedle's items on the basis that Deedle sold the items to intentionally and knowingly to deter customers from purchasing items from Deedle and having Deedle to have Deedle issue refunds for the items that were sold, thereby damaging Deedle's ability to freely and legitimately sell authentic items in the marketplace.

83. Such actions are unlawful, unfair, and fraudulent business practices.

84. As a direct and proximate result Defendants' actions, Deedle has been injured in his business and property as follows: (a) Plaintiff has lost clients and been unable to sell its products, and has lost substantial income and profits as a result; (b) Plaintiff has been precluded from business growth that it otherwise would have achieved; and (c) Plaintiff has otherwise been injured in its business and property.

85. As a result of Defendant's unlawful, unfair, and fraudulent business practices with Deedle's business, Deedle has incurred actual damages in an amount that is ongoing and that has not yet been fully ascertained but which is at least $3,000,000.00 for the loss of sales to his customers and his loss of business that he would have made but for Defendants' actions.

86. In addition, Deedle requests any and all possible exemplary damages as

determined by a jury after a trial against Defendants' for Defendants' egregious and malicious actions against Deedle's business.

87. Furthermore, Deedle requests all costs of court for bringing this claim

**PRAYER**

WHEREFORE, Plaintiff prays for judgment and relief on the Complaint as follows:

1. All of Plaintiff's actual and consequential damages, which are believed to exceed $4,000,000;
2. Treble damages in accordance with the Clayton Act;
3. Exemplary damages as allowed by law;
4. For reasonable attorneys' fees on all applicable claims;
5. For costs of suit incurred herein; and
6. For such other and further relief as the Court may deem necessary or appropriate.

DATED: July 14, 2015

CHRISTMAN, KELLEY & CLARKE, PC

/s/ Matthew Clarke

By: ___________________________

Matthew M. Clarke
Dugan P. Kelley
Matthew N. Mong
Attorneys for Plaintiffs